# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF VIRGINIA
# ROANOKE DIVISION

| | | |
|---|---|---|
| **DENARD DARNELL NEAL,** | ) | |
| Petitioner, | ) | Civil Action No. 7:20cv00295 |
| | ) | |
| v. | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **UNITED STATES** | ) | |
| **PENITENTIARY LEE, et al.,** | ) | By: Pamela Meade Sargent |
| Respondents. | ) | United States Magistrate Judge |

The pro se petitioner, Denard Darnell Neal, ("Neal"), a Bureau of Prisons, ("BOP"), inmate, formerly held at United States Penitentiary Lee, ("USP Lee"), filed this petition for Writ of Habeas Corpus Pursuant to Title 28 U.S.C. Section 2241 seeking judicial review of a disciplinary proceeding that resulted in the loss of good conduct time. By Opinion and Order entered on September 28, 2021, the court granted the respondents' motion to dismiss all claims except Claims Five and Six. (Docket Item No. 28). In Claims Five and Six Neal alleges that his right to due process was violated when the Disciplinary Hearing Officer, ("DHO"), "refused to allow the security video to be used as evidence by the petitioner to present factual video evidence as part of petitioner['s] right to an adequate defense." (Docket Item No. 1, ("Petition"), at 19). The court found that the DHO erred by not viewing the requested security video and referred Claims Five and Six to the undersigned pursuant to 28 U.S.C. § 636 for an evidentiary hearing and report and recommendation regarding whether the DHO's error was harmless. Evidentiary hearings were held before the undersigned on November 15, 2021, and, by video conference, on February 10, 2022.

The matter is also before the undersigned on Petitioner's Pleadings For Summary Judgment And Sanctions Against the United States As A Whole For Acts Of Intentional Interference And Obstruction Of Justice, etc., (Docket Item No. 57), ("Sanctions Motion"), on referral for a report and recommendation.

The undersigned now submits the following report and recommended disposition.

### I.   Facts

At the November 15, 2021, evidentiary hearing, Neal also informed the court that he had been designated for transfer from USP Lee to the United States Penitentiary Florence, ("USP Florence"), in Colorado, but he had been diverted while in transit to the Western District of Virginia to participate in the hearing. Neal stated that, as a result, he had not seen the court's notice scheduling the hearing and, therefore, had been unable to request witnesses or other evidence be produced. Neal also asserted that, because he was diverted to the Western District of Virginia while in transit, he did not have access to his property, including his legal paperwork necessary to present his case. Neal moved to continue the hearing. The court took the matter under advisement and decided to hear testimony from the witnesses present with the option to reconvene later.

At the November 15, 2021, evidentiary hearing, Neal testified that while housed at USP Lee on July 28, 2019, the prison was put on lockdown and the cells in his housing unit were searched. Neal said he was placed in a shower stall while his cell, F-124, was searched. From this shower stall, Neal said, he could see directly into his cell, but staff put a towel up over the cell door window while they were searching his cell.  Neal said, when staff exited his cell, he could see their hands and

no staff member had any weapon in his hand. He said he witnessed staff continue to another cell and search it. When he was placed back in his cell, Neal said, his cell was in disarray. Later that evening, between 5 and 6:30 p.m., Neal said a lieutenant walked up to his cell door and slid two incident reports in the door charging, Neal and his cellmate, Joshua Griffin, with Offense Code 104 for possession of a weapon. Neal said that he was seated at the desk and his cellmate, Griffin, was standing at the cell door watching television when the lieutenant slid the incident reports in the door. He said the lieutenant did not make a statement.

The Incident Report charging Neal was admitted into evidence as Respondents' Exhibit No. 1. (Docket Item No. 36-3) ("Incident Report"). The Incident Report listed J. McGraw as the reporting employee. The Description of Incident section stated:

> On July 18, 2019 at approximately 1:25 p.m. I was participating in a mass shakedown in F Unit. While conducting a shakedown of cell F-124 (which housed inmates Neal, Denard … and Griffin, Joshua …) I recovered a 5 and ¾ inch piece of sharpened, threaded steel with black electrical tape fashioned around one end for a handle. The weapon was located in the bottom locker, which was secured, inside of legal paperwork which had Neal's name and number on it.

Neal testified that Unit Manager Mullins conducted his UDC hearing on the charge, at which Neal requested cellmate Griffin as a witness and asked that the security video be viewed. Neal also testified that he presented a written statement to the DHO in advance of his first disciplinary offense hearing requesting that the security videos of the F Unit recorded on July 18, 2019, between the hours of 1 and 2 p.m. be reviewed because they would show that no staff member exited his cell with a weapon. Neal said he attached a copy of this written statement to his Petition. (Docket Item No. 1-1 at 21.) A copy of this statement was admitted into evidence at

Respondents' Exhibit No. 7. (Docket Item No. 36-9.) Neal testified that, at his disciplinary hearing, he asked the DHO officer to look at the surveillance video to see if the officers who searched his cell came out with any weapon. He said the DHO refused to look at the video because it would not show what occurred inside of Neal's cell.

Neal admitted that he did not request that the DHO review the July 18, 2019, surveillance video of the F Unit at the time that he was served with the Incident Report, because he did not know that Lieutenant Davis was claiming that he had confessed to possession of the weapon. Neal said that he did not learn that Davis had provided evidence of such a statement until he received the DHO's decision. In fact, Neal conceded that he did not make his request for review of the surveillance video of the F Unit at the time he was served with the Incident Report until after he had filed his Petition in this court. Neal further admitted on cross-examination that he was served with the Incident Report at 2:32 p.m. on July 18, 2019. While Neal testified that he did not fill out the Notice Of Discipline Hearing form requesting video evidence admitted as Respondents' Exhibit No. 2, (Docket Item No. 36-4), he admitted that he had requested the DHO review the F Unit video from 1 to 2 p.m. only.

Neal said that the first DHO decision he received referenced the wrong inmate. He said a corrected DHO decision was not provided to him until January 21, 2020, after he had filed his Petition in this court.

The DHO who conducted Neal's disciplinary hearing at issue, Jeff Brown, testified that he had worked as a DHO at USP Lee since August 2019. Brown testified that, after a lieutenant conducts an investigation, if an inmate is to be charged with a disciplinary offense, an Incident Report is written and served on the

inmate. After that, a representative of the Unit Disciplinary Committee, ("UDC"), meets with the inmate and the inmate can request witnesses or other evidence to be considered by the DHO who hears the charge. The charge is then referred to the DHO to conduct a hearing. According to Brown, the DHO would then review the lieutenant's investigation packet, the Incident Report and the UDC form, on which the inmate could request certain evidence, such as surveillance video recordings, be considered.

Brown said that an initial disciplinary hearing regarding the charge against Neal was held on August 7, 2019, at which Neal was informed that the requested representative Anderson was not available. Brown said that no evidence was presented at that hearing. Brown said that he conducted an additional hearing on the charge on August 14, 2019. At this hearing, he went over his rights with Neal and then conducted the disciplinary hearing. Brown said that he prepared three separate Discipline Hearing Officer Reports as a result of the August 14, 2019, disciplinary hearing on the July 18, 2019, charge against Neal. Brown admitted that the first report he issued contained the wrong inmate's name. The Discipline Hearing Officer Report admitted at Respondents' Exhibit No. 3 was the first amended report with the inmate's name corrected to reflect the charge against Neal. (Docket Item No. 36-5.) Brown said that he considered each of the four pieces of evidence listed on the second page of the Report under the Documentary Evidence section. This evidence including a photograph of the weapon officers said they found in Neal's cell on July 18, 2019, which was admitted into evidence as Respondents' Exhibit No. 4, (Docket Item No. 36-6); a Bureau of Prisons Chain of Custody Log, dated July 18, 2019, which was admitted into evidence at Respondents' Exhibit No. 5, (Docket Item No. 36-7); a handwritten statement from Neal, which was admitted into evidence as Respondents' Exhibit No. 7, (Docket Item No. 36-9); and a handwritten statement

from Neal's cellmate, Griffin, which was admitted into evidence as Respondents' Exhibit No. 6, (Docket Item No. 36-8).

Brown admitted that, despite Neal's request, he did not review any video evidence because he said it would not have affected the outcome of his hearing decision. Brown said that Neal requested he review the surveillance video of the F Unit taken from 1 to 2 p.m. on July 18, 2019, the time of the search of his cell, because it would show that the officers who searched his cell did not have a weapon in their hands when they exited his cell. Brown stated that he did not view the video because he knew that staff would not exit a cell with a weapon they had found held in their hands where inmates could see it. He said staff would not have the weapon in their hands because they would not want the inmates to know that a weapon had been found. "I don't expect staff to leave a cell with a weapon out in the open," Brown said. He said the officers might not have a weapon in their hands because one of them had placed it in his pocket. Brown admitted, however, that there should have been no inmates out of their cells when the officers exited Neal's cell after their search. Brown said that he was familiar with the video recordings made by the surveillance cameras in the F Unit. These cameras, he said, recorded the common area of the unit, but did not show the inside of the cells. Even if one of the officers did possess a 6-inch weapon in his hand as he exited Neal's cell, Brown said, it would be difficult to see that on the surveillance video.

Brown said that Neal never requested that he review the surveillance video for the time at which Davis served him with the Incident Report. Brown said that, if the surveillance video had shown that Davis did not stop and speak with Neal as Davis claimed, he could have committed the discipline offense charged against Neal back to the investigating lieutenant for further investigation.

Brown said that the Discipline Hearing Officer Report admitted into evidence as Respondents' Exhibit No. 8, (Docket Item No. 36-10), was the second amended report, which he issued to further clarify why he had determined that the requested video evidence would not have been relevant. On this Report, Brown wrote:

> The DHO notes inmate Neal requested the video be reviewed to facilitate his defense. Specifically, he alleged video would reveal staff exited his living quarters at the conclusion of search with no weapon being visible in their possession, which would exonerate him from the charges. The DHO indicated the camera would not be reviewed as it had no bearing on the incident report. The camera does not film inside the cell. Accordingly, it cannot aid Neal's defense that a dangerous weapon was not discovered in the bottom locker of his assigned living quarter or support the staff member's statement that a dangerous weapon was discovered in the bottom locker of inmate Neal's assigned living quarters. As staff may secure a weapon coming out of a cell, for example by placing it in a pocket, a video showing a staff member coming out of a cell without a weapon being visible could not establish a weapon did not exist.

(Docket Item No. 36-10 at 2.) Brown said that, if the video recording had shown no weapon in the officers' hands as they exited Neal's cell, it would not have changed the decision he made.

On cross-examination, Brown admitted that the Incident Reports admitted into evidence at Petitioner's Exhibit Nos. 1 and 2, (Docket Item Nos. 36-1, 36-2), both charged Neal with prior violations of Disciplinary Offense 104 for possession of a weapon found in a search of his secured locker among legal papers. Brown said that he does not remember whether he expunged these charges against Neal. Brown did concede that he had seen other incident reports describing similar scenarios where an inmate was charged for a weapon found in a secured locker among legal papers. Brown said that he did not remember whether he conducted a hearing

regarding a weapon charge levied against Neal's cellmate, Griffin. He did admit that, if Griffin had a disciplinary hearing, he would have conducted the hearing.

Brown conceded that there was no BOP policy requiring officers to place weapons found during cell searches in their pockets when they exited a cell. He also admitted that he did not know what the BOP policy was with regard to securing contraband weapons in an evidence bag. Brown testified that Respondents' Exhibit Nos. 5 and 6 showed that Officer McGraw found the weapon in Neal's cell, gave the weapon to Edwards, who photographed it, and then dropped it in the Overnight Drop Box at 2:30 p.m. on July 18, 2019.

Brown further conceded on cross-examination that he should have received the Notice of Discipline Hearing form, (Respondents' Exhibit No. 2), before conducting Neal's hearing. Brown also conceded that he did not notify SIS to download and preserve the requested video evidence after he received this form. Instead, Brown said, he wanted to know why Neal was requesting that he view the surveillance video. Brown said that he first met with Neal on August 7, 2019. At that time, Brown said, he informed Neal that Anderson was not available to be his representative, and Neal asked him to pick another representative. Brown testified that, at the time of his August 14, 2019, hearing, Neal was aware of Davis's claim that Neal had admitted he possessed the charge weapon.

After the November 15, 2021, evidentiary hearing, and at the direction of the court, counsel for the respondents notified the court that seven boxes of Neal's property had arrived at USP Florence. (Docket Item No. 37). The court concluded that, to allow Neal to have access to the legal materials contained in his property, Neal should be transported to USP Florence, where his evidentiary hearing would reconvene by video conference. The evidentiary hearing reconvened on February

10, 2022. When the hearing reconvened by videoconference on February 10, Neal moved to continue the hearing because he had not been provided with all of his property. In particular, Neal stated that he had been provided with only five of his seven boxes of property. Neal said that the two boxes that he had not been provided contained the legal materials and notes he needed to proceed in this case. The court took the motion to continue under advisement, but continued with the videoconference hearing to hear from the witnesses present. The court also ordered counsel for the respondent to file an explanation with court as to why Neal had not been provided with access all of his property prior to the hearing.

Neal's USP Lee cellmate Joshua Patrick Griffin testified by video conference at the February 10, 2022, hearing. Griffin said, in July 2019, he was housed in a cell with Neal at USP Lee. Griffin said on July 28, 2019, he was removed from his cell and placed in the showers to be strip searched as his cell was searched. He said from the shower stall he could see the entire housing unit. Griffin said that, while his cell was searched, the officers shut the cell door and covered the cell window, so he could not see inside the cell. Because of this, Griffin said, any surveillance video taken could not have recorded what occurred in his cell on that day. Griffin said that he did see three staff members exit his cell. He testified that he could see their hands clearly, and no one was carrying anything in his hands as they exited his cell. Griffin said he also did not see anything in any staff member's pocket as he exited the cell, although he conceded he could not see inside anyone's pocket. Griffin said no staff member came to him and told him they found anything in his cell prior to receiving the Incident Report.

Griffin testified that, when Unit Manager Mullins came to their cell door to conduct Neal's UDC hearing, he heard Neal ask Mullins to preserve the surveillance video taken in the housing unit on the day of the search of their cell. He said that he

also heard Neal ask that he be a witness at Neal's disciplinary hearing. Griffin said he heard Mullins tell Neal that it did not matter because he was going to be fined regardless. Griffin said that Neal had been placed in the SHU when Griffin was served with an Incident Report charging him with a disciplinary offense based on the July 28, 2019, cell search. Griffin said that Collins, and not Brown, conducted his disciplinary hearing. He said that Collins told him that they were going to "thrown mine out and stick it to [Neal]." Despite this testimony, on cross-examination, Griffin stated that he was never charged with a disciplinary offense based on the July 28, 2019, cell search.

On February 17, 2022, the respondent filed a Notice of Information Requested By The Court, (Docket Item No. 54). Attached to this filing were affidavits from Charles Barnette, ("Barnette"), and Michael Hagans, ("Hagans"). In his affidavit, (Docket Item No. 54-1), Barnette stated that he was the Supervisory Correctional Specialist at USP Lee, and, in this position, he oversaw the mailroom at USP Lee. Barnette stated that, when an inmate at USP Lee is designated to another facility, his property is inventoried and packed. Once the property is inventoried, the property is reviewed with the inmate. Once the property is reviewed with the inmate, the property inventory form is placed in the box, the box is sealed and prepared for shipment to the new institution. According to Barnette, all inmate property boxes are shipped through a service that provides tracking numbers so that each individual box may be tracked.

Barnette stated that, upon Neal's redesignation to USP Florence, Neal was given the opportunity to review his property, which was inventoried and packed in seven boxes, which were shipped to USP Florence via UPS on September 7, 2021. Barnette stated that, after the court inquired about the status of Neal's property in February, he learned that only six of the seven boxes were delivered to USP

Florence. Barnette stated that he contacted UPS in an attempt to determine the location of the seventh box. UPS informed Barnette that the seventh box, had its shipping label destroyed in transit. It was given a new tracking number and delivered to UPS's lost and found facility in Salt Lake City, Utah, on September 30, 2021. According to UPS, it only keeps packages at its lost and found facility for three months, so the seventh box and its contents would have been destroyed on or about December 30, 2021.

Attached to Barnette's affidavit were the inventory forms for each of Neal's seven property boxes, (Docket Item No. 54-1 at 4-10), the receipt from UPS showing that Neal's seven property boxes were shipped from USP Lee to USP Florence on September 7, 2021, (Docket Item No. 54-1 at 11), and a Delivery Notification form from UPS showing that the box which was given the new tracking number was delivered to UPS's Salt Lake City facility, (Docket Item No. 54-1 at 17). The inventory forms show that five of Neal's seven boxes of property contained legal materials. (Docket Item No. 54-1 at 4-10.)

Based on this filing, the court ordered counsel for the respondent to provide an explanation to the court as to why she had inaccurately informed the court in November that all seven of Neal's property boxes had been delivered to USP Florence. Counsel then filed a Notice Of Information Requested By Court, (Docket Item No. 56), which stated that, following the November hearing, she spoke with counsel for the Bureau of Prisons, who inquired and informed her that Neal had seven boxes of property at USP Florence. Counsel stated that she relied on the representation without requesting any written verification. Counsel stated that, after the February hearing, she made inquiry regarding Neal's property and discovered that he had not received one box of his property because it had been lost by UPS.

On February 28, 2022, Neal filed the Sanctions Motion seeking the entry of summary judgment in his favor and other relief as a sanction for what he alleges was the government's purposeful theft of his legal materials to prevent him from pursuing his petition. In the Sanctions Motion, which was signed under penalty of perjury, Neal continues to assert that he received only five of his seven property boxes. While the Sanctions Motion contains allegations that various government actors, including the U.S. Attorney's Office for the Western District of Virginia and BOP employees at USP Lee and USP Florence, have purposefully deprived Neal of his legal materials, Neal has provided no evidence from anyone with any personal knowledge to contradict the respondent's evidence that one box of his property was, instead, lost in transit to USP Florence by UPS.

In response to the Sanctions Motion, the respondent filed excerpts of the transcript of the November 15, 2021, evidentiary hearing where Neal stated that his property was packed in only six boxes for transit from USP Lee to USP Florence. (Docket Item No. 63-1 at 19.)

### I.    Analysis

Prisoners may not be deprived of life, liberty, or property without due process of law. *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974). However, the Due Process Clause applies only when government action deprives an individual of a legitimate liberty or property interest. *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 570 (1972). "An inmate has a liberty interest in good time credit and no state may constitutionally deprive him of that good time credit without due process of law." *Moses v. Bledsoe*, No. 1:03cv149, 2004 WL 3317657, at *2 (N.D. W. Va. Sept. 28, 2004).

The Supreme Court described the process due a prisoner accused of a disciplinary infraction in *Wolff*: (1) the inmate must receive written notice of the charges; (2) he must be allowed to call witnesses and present documentary evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals; and (3) there must be a written statement by the factfinder as to the evidence relied on and the reasons for the decision. 418 U.S. at 564-66; *see also Masengale v. Streeval*, No. 7:19-cv-543, 2020 WL 4227559, at *4 (W.D. Va. July 23, 2020) (citing *Wolff*, 418 U.S. at 564).

In *Lennear v. Wilson*, the Fourth Circuit held that an inmate at risk of being deprived of good time credits he has earned against his prison sentence has "a qualified right to obtain *and* compel consideration of video surveillance evidence," 937 F.3d 257, 274 (4th Cir. 2019), "particularly evidence that is potentially exculpatory or otherwise likely to assist an inmate in mounting a defense," 937 F.3d at 270, provided it would not be "unduly hazardous to institutional safety or correctional goals." 937 F.3d. at 273 (quoting *Wolff*, 418 U.S. at 566). After an inmate timely requests existing video footage or other documentary evidence:

> (1) [T]he government bears the burden of establishing a legitimate penological justification for refusing to consider such evidence; (2) whether an asserted penological justification warrants denying consideration of such evidence must be assessed on a case-by-case basis; (3) to the extent consideration of such evidence is denied on grounds that the evidence is not pertinent, that determination must be made by the hearing officer, not prison officials involved in lodging the charge; and (4) before categorically refusing to consider such evidence, the government should assess whether any alternative avenues exist for permitting consideration of the evidence, in some form, that protect the asserted legitimate penological consideration for restricting consideration of such evidence.

937 F.3d. at 273; *see also Morales Mancia v. Elam*, No. 7:19cv00625, 2021 WL 4164686, at *5 (W.D. Va. Sept. 13, 2021) (quoting *Lennear*, 937 F.3d at 273). Officials may withhold sharing institutional concerns about viewing the video footage until the disciplinary hearing is completed, or even until they are defending a court action on the matter. *Lennear*, 937 F.3d at 270. "But if prison officials fail to identify a specific safety or correctional concern, courts may not 'speculate' as to the officials' potential reasons for denying an inmate access to evidence in order to uphold a disciplinary decision." *Lennear*, 937 F.3d at 270.

"The key to triggering access to, and consideration of, video surveillance evidence is the inmate's request." *Whatley v. Streeval*, 2021 WL 4395807, at *4 (W.D. Va. Sept. 27, 2021) (citing *Lennear*, 937 F.3d at 272). In this case, Neal, before his disciplinary hearing, specifically asked that the surveillance video of his housing unit be reviewed from 1 to 2 p.m. on the day of the search of his cell. Neal has further conceded that, prior to his disciplinary hearing, he did not request anyone review the surveillance video from the time he was served with the Incident Report. In fact, he admitted that he did not request this video until after he had filed this suit in this court. The respondent has not offered any penological or security reason for the DHO's refusal to review and provide the requested video. Instead, the respondent argues that Brown did not view the video because he determined it would not be relevant because it would not show what was found inside of Neal's cell. Neal argues that the requested surveillance video would have shown that the officers who searched his cell exited his cell with nothing in their hands, which would bolster his statement that they did not find a weapon in his cell because he never possessed a weapon.

Insofar as Neal argues that his due process rights were violated by the DHO's refusal to view the surveillance video from the time he was served with the Incident

Report, I find that his rights were not violated in that he has now admitted that he never requested the DHO view this video. Insofar as Neal argues that his due process rights were violated by the DHO's refusal to view the surveillance video from the time of the search of his cell, I cannot find that the DHO's failure to obtain and view this video was harmless. Since there is no evidence that anyone every retrieved and reviewed the requested surveillance video, there is no evidence before the court of what the video contained. While DHO Brown appeared and offered self-serving testimony that he would have found Neal guilty of the disciplinary offense charged even if the video clearly showed that the officers exited the cell without a weapon in their hands, without knowing what was contained on the video, there is no way to know whether it could have assisted Neal in mounting a defense.

Based on the above-stated reasons, I recommend that the court find that DHO Brown violated Neal's due process rights by not retrieving and reviewing the requested surveillance video and that the failure to do so was not harmless.

With regard to the Sanctions Motion, I recommend that the court deny the Sanctions Motion. The evidence before the court does not show any purposeful effort by the respondents or respondents' counsel to deny Neal access to legal materials to pursue his claims. Instead, the evidence before the court shows that one box of Neal's property, which did contain legal materials, was simply lost in transit.

## PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Neal timely requested that the DHO retrieve and review the surveillance video from his housing unit at the date and time of the search of his cell;

2. Neal did not timely request that the DHO retrieve and review the surveillance video from his housing unit at the date and time that he was served with the Incident Report;

3. The DHO's failure to produce and review the requested surveillance video from Neal's housing unit at the date and time of the search of his cell was not harmless, and, therefore, violated Neal's due process rights; and

4. While a box of Neal's property containing legal material was irretrievably lost in transit, there is no evidence that the respondents or respondents' counsel was responsible for the loss of this box of property.

## RECOMMENDED DISPOSITION

Based on the above-stated reasons, I recommend that the court find that the DHO's failure to produce and review the requested surveillance video from Neal's housing unit at the date and time of the search of his cell was not harmless. I further recommend that the court deny the Sanctions Motion.

## **Notice to Parties**

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

> Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send copies of this Report and Recommendation to all counsel of record and unrepresented parties.

DATED: July 6, 2022.

/s/ *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE